FILED

2022 Sep-28  PM 01:48
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### JASPER DIVISION

| | | |
|---|---|---|
| JACKIE N. PEARSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 6:20-cv-01210-AMM |
| | ) | |
| SOCIAL SECURITY | ) | |
| ADMINISTRATION, | ) | |
| Commissioner, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OF DECISION

Plaintiff Jackie Pearson brings this action pursuant to the Social Security Act (the "Act"), seeking review of the decision of the Commissioner of Social Security ("Commissioner") denying her claim for a period of disability and disability insurance benefits ("benefits"). *See* 42 U.S.C. § 405(g). Based on the court's review of the record, the court **AFFIRMS** the decision of the Commissioner.

## I.    Introduction

On July 3, 2018, Ms. Pearson protectively filed an application for benefits under Title II of the Act, alleging disability as of February 22, 2018. R. 15, 97–113. Ms. Pearson alleges disability due to migraines, seizures, Chron's disease, lumphlcist (sic), heart problems, and tremors. R. 98. She has at least a high school education, is able to communicate in English, and has past relevant work experience

1

as a billings/collections clerk, corrections officer, medical receptionist, medical assistant, and medical clerk. R. 27–28.

The Social Security Administration ("SSA") initially denied Ms. Pearson's application on October 24, 2018. R. 15, 112–14, 116–18. On November 20, 2018, Ms. Pearson filed a request for a hearing before an Administrative Law Judge ("ALJ"). R. 15, 123–24. That request was granted. R. 125–27. Ms. Pearson received a video hearing before ALJ Perry Martin on October 2, 2019. R. 15, 36–64. On November 13, 2019, ALJ Martin issued a decision, finding that Ms. Pearson was not disabled from February 22, 2018 through the date of his decision. R. 12–29. Ms. Pearson was thirty-nine years old at the time of the ALJ decision. R. 27, 97.

Ms. Pearson appealed to the Appeals Council, which denied her request for review on June 18, 2020. R. 1–3, 178–79. After the Appeals Council denied Ms. Pearson's request for review, R. 1–3, the ALJ's decision became the final decision of the Commissioner and subject to district court review. On August 19, 2020, Ms. Pearson sought this court's review of the ALJ's decision. *See* Doc. 1.

## II.     The ALJ's Decision

The Act establishes a five-step test for the ALJ to determine disability. 20 C.F.R. § 404.1520. *First*, the ALJ must determine whether the claimant is engaging in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). "Substantial work activity is work activity that involves doing significant physical or mental activities."

2

20 C.F.R. § 404.1572(a). "Gainful work activity" is work that is done for pay or profit. 20 C.F.R. § 404.1572(b). If the ALJ finds that the claimant engages in substantial gainful activity, then the claimant cannot claim disability. 20 C.F.R. § 404.1520(b). *Second*, the ALJ must determine whether the claimant has a medically determinable impairment or a combination of medical impairments that significantly limits the claimant's ability to perform basic work activities. 20 C.F.R. §§ 404.1520(a)(4)(ii), (c). Absent such impairment, the claimant may not claim disability. *Id*. *Third*, the ALJ must determine whether the claimant's impairment meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526. If such criteria are met, the claimant is declared disabled. 20 C.F.R. § 404.1520(a)(4)(iii).

If the claimant does not fulfill the requirements necessary to be declared disabled under the third step, the ALJ still may find disability under the next two steps of the analysis. The ALJ must first determine the claimant's residual functional capacity, which refers to the claimant's ability to work despite her impairments. 20 C.F.R. §§ 404.1520(e), 404.1545. In the *fourth* step, the ALJ determines whether the claimant has the residual functional capacity to perform past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the ALJ determines that the claimant is capable of performing past relevant work, then the claimant is deemed not disabled. *Id*. If the

ALJ finds the claimant unable to perform past relevant work, then the analysis proceeds to the *fifth* and final step. 20 C.F.R. § 404.1520(a)(4)(v). In this step, the ALJ must determine whether the claimant is able to perform any other work commensurate with her residual functional capacity, age, education, and work experience. 20 C.F.R. § 404.1520(g)(1). Here, the burden of proof shifts from the claimant to the Commissioner to prove the existence, in significant numbers, of jobs in the national economy that the claimant can do given her residual functional capacity, age, education, and work experience. 20 C.F.R. §§ 404.1520(g)(1), 404.1560(c).

The ALJ determined that Ms. Pearson would meet the insured status requirements of the Act through December 31, 2020. R. 16, 18. Next, the ALJ found that Ms. Pearson had not engaged in substantial gainful activity since February 22, 2018, the alleged disability onset date. R. 18. The ALJ decided that Ms. Pearson had the following severe impairments: migraines, seizures, degenerative disc disease, colitis, complex regional pain syndrome, mitral valve prolapse, neurocognitive disorder, depression, and anxiety. R. 18. The ALJ found that Ms. Pearson's asthma and hypertension were "non-severe" impairments because "the record does not show that these impairments cause more than a minimal impact" on Ms. Pearson's ability to function. R. 18. Overall, the ALJ determined that Ms. Pearson did not have "an

impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments" to support a finding of disability. R. 18.

The ALJ found that Ms. Pearson's "statements concerning the intensity, persistence[,] and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." R. 22. The ALJ found that Ms. Pearson had the "residual functional capacity to perform sedentary work" with certain limitations. R. 21. The ALJ determined that Ms. Pearson may occasionally: push or pull with her upper and lower extremities; balance or stoop; and be exposed to extreme heat and cold, vibration, fumes, odors, chemicals, gases, dust, and poorly ventilated areas. R. 21. Further, the ALJ determined that Ms. Pearson must not: climb ladders or scaffolds; kneel, crouch, or crawl; perform commercial driving; walk on uneven or slippery surfaces; and be exposed to dangerous machinery or unprotected heights. R. 21. The ALJ also determined that "[d]uring a regularly scheduled workday," Ms. Pearson can: "1. Understand and remember short and simple instructions, but is unable to [do] so with detailed and complex instructions. 2. Do simple, routine, repetitive tasks, but is unable to do so with complex tasks. 3. Deal with changes in workplace, if introduced occasionally, gradually, and well-explained. 4. Occasionally miss 1 day of work per month due to impairments." R. 21.

According to the ALJ, Ms. Pearson is "unable to perform any past relevant work," she is "a younger individual," and she has "at least a high school education," as those terms are defined by the regulations. R. 27–28. The ALJ determined that "[t]ransferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is 'not disabled,' whether or not the claimant has transferable job skills." R. 28. Because Ms. Pearson's "ability to perform all or substantially all of the requirements of this level of work" was impeded by additional limitations, the ALJ enlisted a vocational expert to ascertain whether there were a significant number of jobs in the national economy that Ms. Pearson would be capable of performing. R. 28. That expert testified that there are indeed a significant number of such jobs in the national economy, such as a table worker, an order clerk, and a cuff holder. R. 28.

Based on these findings, the ALJ concluded that Ms. Pearson did not have a disability as defined in the Act, from February 22, 2018 through the date of the decision. R. 29. Ms. Pearson now challenges that decision.

### III. Factual Record

Ms. Pearson was treated for migraines by Dr. Thomas Patton at Alabama Neurology and Sleep Medicine beginning in 2015. R. 458–59. This treatment for migraines continued through the alleged onset date and included Botox injections

and nerve blocks, in addition to medication. R. 470–512. As part of this treatment, Ms. Pearson underwent an MRI of the brain on April 2, 2015. R. 520. It showed "no apparent interval change" as compared to a 2012 MRI and "no evidence of a mass, mass effect, hemorrhage, ischemia, or significant white matter change." R. 520.

Ms. Pearson was treated by a chiropractor for complaints of headaches, neck pain, right upper and lower back pain, right buttocks pain, and right arm weakness pain, from October 11, 2016 through December 19, 2016. R. 277–302.

Ms. Pearson presented to DCH – Northport Medical Center's emergency department on March 18, 2017 complaining of fever, swelling in her feet and legs, and rib pain after a fall. R. 332. Ms. Pearson underwent X-rays of her right ribs, which revealed no acute fracture, and her right hip which revealed no abnormality. R. 336. Ms. Pearson was treated by Alabama Neurology and Sleep Medicine on May 5, 2017. R. 328–31.

Ms. Pearson underwent an EEG on April 20, 2017. R. 517. It was "normal during the recorded states" and "[n]o definite interictal epileptiform discharges or seizures were recorded." R. 517. Also on April 20, 2017, Ms. Pearson underwent an MRI of the brain which revealed "no evidence of a mass, mass effect, hemorrhage, ischemia, or significant white matter change." R. 518.

Ms. Pearson presented to family medicine doctor, Dr. Katherine Grelle, on May 4, 2017 complaining of menopause, edema, and migraines. R. 410. Dr. Grelle advised Ms. Pearson to follow up with cardiology and neurology. R. 413.

Ms. Pearson presented to Dr. William Standeffer at University Orthopaedic Clinic and Spine Center on May 19, 2017 and June 12, 2017. R. 423, 426. She complained of left foot pain from a left foot stress fracture that occurred on April 22, 2017. R. 424, 426.

Ms. Pearson underwent a sleep study on June 6, 2017. R. 516. It showed "no evidence of a sleep-related breathing disorder" and "[n]o seizure activity." R. 516.

Ms. Pearson returned to Dr. Grelle on September 21, 2017 complaining of seizures, migraines, depression, and anxiety. R. 406. Ms. Pearson was treated with Botox, and stated that she would have a stimulator "placed to help with migraines and seizures." R. 406.

Ms. Pearson presented to DCH – Northport Medical Center's emergency department on July 23, 2017 complaining of a migraine headache. R. 317–18. Ms. Pearson underwent a CT scan, which revealed: "No intracranial hemorrhage, mass effect, or clearly acute finding by CT." R. 323. Ms. Pearson was advised to follow-up with her regular doctor as needed. R. 324. Ms. Pearson underwent an MRI of the cervical spine on September 27, 2017. R. 315. The MRI revealed "1. Straightening of normal cervical curvature. 2. Minimal degenerative change as described." R. 367.

Ms. Pearson presented to Dr. Matthew Rupert on October 2, 2017 for radiating neck pain. R. 358. Ms. Pearson's neurologist "suggested she discuss neuromodulation with spinal cords stimulation as an option," which is why she presented to Dr. Rupert. R. 358. Dr. Rupert diagnosed Ms. Pearson with complex regional pain syndrome. R. 359.

Ms. Pearson returned to Dr. Grelle on October 25, 2017 seeking surgical clearance. R. 402. Ms. Pearson had a trial spinal cord stimulator placed on November 9, 2017. R. 352. She presented to Dr. Rupert on November 13, 2017 for mid-trial program and analysis. R. 352. The visit notes indicate ninety percent overall pain relief. R. 352. Ms. Pearson indicated that she wished to proceed with a permanent stimulator. R. 353.

Ms. Pearson returned to Dr. Grelle on November 28, 2017 seeking surgical clearance. R. 397. Ms. Pearson had a spinal cord stimulator placed in December 2017. R. 348, 361. The purpose of the stimulator was to help with radiating neck pain, seizures, and migraines. R. 304–05, 348.  At her first follow-up appointment with Dr. Rupert, on December 26, 2017, he noted that she was experiencing "positive results" and was eighty-five percent improved. R. 351. Ms. Pearson was advised to follow up in six weeks. R. 351.

Ms. Pearson returned to Dr. Grelle on January 19, 2018, complaining of depression, anxiety, GERD, and low back pain. R. 393.

Ms. Pearson presented to Dr. Rupert on February 7, 2018 to follow up on her stimulator for radiating neck pain. R. 348. Ms. Pearson was "[t]reated with spinal cord stimulation with positive results[,]" and she feels she is eighty-five percent improved. R. 349. Ms. Pearson was advised to follow up in three months. R. 349.

Ms. Pearson returned to Dr. Grelle on February 9, 2018 complaining of depression, anxiety, upper respiratory symptoms, and GERD. R. 389. She was treated for an upper respiratory infection. R. 392. Ms. Pearson returned to Dr. Grelle on March 9, 2018 complaining of depression and anxiety. R. 385. Dr. Grelle increased her medication to treat her panic attacks. R. 388. Ms. Pearson returned to Dr. Grelle on March 28, 2018 complaining of depression, anxiety, dizziness, nausea, vomiting, and hypertension. R. 380.

Ms. Pearson presented to DCH – Northport Medical Center's emergency department on April 3, 2018 complaining of lower back pain. R. 304. Ms. Pearson stated that "she had a[n] unwitnessed focal seizure approximately 5 days prior and fell and has had worsening pain since." R. 304. Ms. Pearson underwent a CT scan, which revealed: "Accentuation of the lumbar lordosis which has been described previously. No acute fracture. No significant malalignment. Mild lumbar disc disease suggested." R. 308–09. Ms. Pearson was discharged with medication and advised to follow-up with her regular doctor as needed. R. 310–11.

Ms. Pearson returned to Dr. Patton on April 3, 2018 for her migraines. R. 470. She reported "doing slightly worse" since her last visit. R. 470. Dr. Patton noted that Ms. Pearson "is some better since the neurostimulator placement but is slightly worse than when she was last seen." R. 472. Ms. Pearson was advised to continue to follow up with Dr. Rupert, to take medications as directed, and to return to neurology in four to six months. R. 472.

Ms. Pearson presented to Dr. Rupert on April 11, 2018 to follow up on her stimulator for radiating neck pain. R. 344. Dr. Rupert's assessment states that Ms. Pearson was "[t]reated with spinal cord stimulation with positive results[]" including seventy-five to eighty percent improvement. R. 345. Ms. Pearson was advised to follow up in six to eight months. R. 345.

Ms. Pearson returned to Dr. Patton on June 20, 2018 for her migraines. R. 465. She reported that since her last visit, she was doing in some ways better and in other ways worse. R. 465. While she reported a "significant reduction in migraines," she also reported having more spells. R. 465. She was advised to continue following up with Dr. Rupert, take medication as prescribed, and to return to neurology in four months. R. 467.

Ms. Pearson returned to Dr. Grelle on June 19, 2018 complaining of seizures, depression, and anxiety. R. 376. Ms. Pearson reported that "she was seizure free for

several months but over the last 6 weeks she has had absence seizures, tremors[,] and other types of seizures" resulting in falls and bruising. R. 376.

Ms. Pearson presented to Dr. Scott Atkins at University Orthopaedic Clinic for knee pain on July 26, 2018. R. 420. Ms. Pearson fell causing sudden injury to her left knee. R. 420. Dr. Atkins ordered X-rays that showed "good alignment with no evidence of fracture, bony abnormalities[,] or degenerative changes." R. 422. Ms. Pearson was diagnosed with left knee contusion and treated with physical therapy and analgesics. R. 422.

Ms. Pearson presented to the UAB Callahan Eye Hospital Clinic on September 11, 2018 for an evaluation for diplopia. R. 431. The visit notes state that Ms. Pearson "was diagnosed with focal seizures in 2016," has a "spinal stimulator to help with her migraines," "is not driving due to her focal seizures," "noticed horizontal diplopia" in 2018, and is photophobic. R. 431. Ms. Pearson was diagnosed with monocular diplopia of her left eye, and was advised to avoid chronic caffeine, restart Botox, consider gabapentin, and return for a follow-up visit in six months. R. 437.

Ms. Pearson returned to Dr. Grelle on September 24, 2018 complaining of vitamin D deficiency, hypertension, diplopia, seizures, eye crusting, depression, and anxiety. R. 617. Ms. Pearson reported that her seizures had "not been controlled." R. 617. Dr. Grelle provided instructions regarding medications and advised Ms.

Pearson to continue to follow up with neurology for her seizures and to return in one month for a blood pressure check. R. 625.

Ms. Pearson returned to Dr. Patton on September 26, 2018 for continued treatment of migraines. R. 459. Ms. Pearson reported that her migraines were doing "slightly worse" and she was having more spells – "up to 5 events a month." R. 459. She also reported that she was "not sure if the stimulator is working." R. 459. Dr. Patton's assessment states in part that Ms. Pearson "initially got some better from neurostimulator placement but it is unclear if they are helping at this time. The etiology of her spells remains unknown . . . . I am concerned that she may have a type of complex partial seizure." R. 461. Dr. Patton advised Ms. Pearson to continue medication and follow up in four months. R. 461.

Dr. Mark Prohaska conducted a Confidential Disability Evaluation on October 10, 2018. R. 525. Ms. Pearson reported a "history of seizure disorder, first diagnosed in 2014"; various cognitive symptoms, including poor memory and intermittent diplopia; and additional medical issues, including frequent migraines, Crohn's disease, lymphocytes colitis, heart problems, tremors, and poor equilibrium. R. 525. Dr. Prohaska's evaluation identified these diagnostic impressions: Axis I: Neurocognitive Disorder (mild, secondary to seizure disorder); Axis II: No diagnosis; Axis III: Deferred to medical providers. R. 526. Dr. Prohaska summarized in part: "From a cognitive standpoint, Ms. Pearson appears to be functioning in the

average range of intelligence; however, based on her self-report, she has limitations in cognitive abilities since the onset of her seizure disorder that are impacting her daily functioning (particularly in attention, concentration, and memory). Although there was some evidence of cognitive limitations on the brief mental status examination conducted as part of this evaluation, additional testing with more extensive and sensitive neurocognitive measures would be needed to fully identify underlying cognitive deficits and determine their functional impact." R. 526.

Ms. Pearson presented to DCH – Northport Medical Center's emergency department on November 8, 2018 complaining of migraine, nausea, and body aches. R. 566.

On December 4, 2018, Ms. Pearson underwent an EEG for her history of seizures. R. 544. "The EEG was normal during the recorded states." R. 544.

Ms. Pearson presented to Dr. Rupert on December 12, 2018 to follow up on her stimulator for radiating neck pain. R. 550. The visit notes state in part that Ms. Pearson's "pain is a little worse since [the] last visit"; she has had recent flare ups; she "is getting about 40% relief with the stim[ulator]"; and she states she is overall "greater than 50% improve[d]" while her husband "states that she is at least 75% improved." R. 550. Her stimulator was programmed and she was advised to follow up in one year. R. 551.

Ms. Pearson returned to Dr. Grelle on January 22, 2019 complaining of hypertension, seizures, depression, anxiety, and allergies. R. 626. Dr. Grelle provided medication instructions and advised Ms. Pearson to continue to follow up with specialists and return in three months. R. 629.

Ms. Pearson returned to Dr. Patton on February 1, 2019 for her migraines. R. 541. At that visit, Ms. Pearson reported continuing to "struggle with symptoms." R. 541. Also, she reported having "two spells since being discharged from the UAB EMU." R. 541. Dr. Patton's assessment includes: "She initially got some better from neurostimulator placement but it is unclear if they are helping at this time." R. 543. He also wrote: "The etiology of her spells remains unknown but the event captured on her EMU admission (Jan 2019) was non-epileptic." R. 543. She was advised to follow-up in four months. R. 543.

Dr. Patton answered a questionnaire dated March 5, 2019. R. 529. In it he opined that she was not "able to sustain an 8-hour work day in a competitive work environment" and that her "condition [is] expected to last 12 months or longer at the current level of severity." R. 529. He also estimated that on average Ms. Pearson "would be unable to complete an 8-hour workday or be absent from work" four days per month. R. 529.

Ms. Pearson returned to Dr. Grelle on March 11, 2019 complaining of being overweight, hypertension, depression, and anxiety. R. 631. Dr. Grelle reviewed

medications with Ms. Pearson and advised her to follow up in one month for a weight check. R. 634. Ms. Pearson returned on March 21, 2019 complaining of back pain and an upper respiratory infection. R. 636. Ms. Pearson returned on April 23, 2019 complaining of hypertension, low vitamin D, seizures, right thumb pain, depression, anxiety, and hyperlipidemia. R. 642–43. Ms. Pearson's right elbow was X-rayed and there was "[n]o acute fracture, dislocation[,] or joint effusion." R. 647.

Ms. Pearson presented to DCH – Northport Medical Center's emergency department on May 5, 2019 complaining of right shoulder and neck pain after a fall. R. 558, 579. An X-ray showed "[n]o fracture or dislocation," and Ms. Pearson was advised to follow up in two days with Dr. Atkins. R. 562–63. Ms. Pearson followed up with Dr. Atkins on May 7, 2019. R. 577. Dr. Atkins diagnosed her with a sprained right thumb and a contusion of her right shoulder. R. 578. She was prescribed physical therapy. R. 578.

Ms. Pearson returned to Dr. Patton on May 10, 2019 for her migraines. R. 538. Dr. Patton's notes state that "[s]ince the patient's last visit she continues to struggle with symptoms[,]" but that "[s]he is better in terms of her migraines . . . [and] is about 60% better in terms of her headaches." R. 538. Dr. Patton's assessment includes: "She initially got some better from neurostimulator placement but it is unclear if they are helping at this time." R. 540. He also wrote: "The etiology of her spells remains unknown but the event captured on her UAB EMU admission (Jan

2019) was non-epileptic. Her last event was 5/7/19." R. 540. She was advised to follow-up in four months. R. 540.

Ms. Pearson returned to Dr. Grelle on July 30, 2019 complaining of hypertension, hyperlipidemia, vitamin D deficiency, depression, anxiety, seizures, and insomnia. R. 651–52.

Ms. Pearson returned to Dr. Patton on September 13, 2019 for her migraines. R. 604–05. Ms. Pearson reported continued struggles with symptoms, having "a few spells," and that the spells are not severe, but that she "loses track of time occasionally." R. 604. At the visit, Ms. Pearson received Botox injections and a right greater occipital nerve block. R. 605.

## IV.   Standard of Review

This court's role in reviewing claims brought under the Act is a narrow one. The only issues before this court are whether the record reveals substantial evidence to sustain the ALJ's decision, *see* 42 U.S.C. § 405(g); *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), and whether the correct legal standards were applied, *see Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). The Act mandates that the Commissioner's findings are conclusive if supported by "substantial evidence." *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *see* 42 U.S.C. § 405(g). This court may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the

Commissioner; instead, it must review the record as a whole and determine if the decision is reasonable and supported by substantial evidence. *See Martin*, 894 F.2d at 1529 (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

Substantial evidence falls somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Martin*, 894 F.2d at 1529 (quoting *Bloodsworth*, 703 F.2d at 1239). If the Commissioner's factual findings are supported by substantial evidence, they must be affirmed even if the preponderance of the evidence is against the Commissioner's findings. *See Martin*, 894 F.2d at 1529. No decision is automatic, for "[d]espite th[e] deferential standard [for review of claims], it is imperative that th[is] Court scrutinize the record in its entirety to determine the reasonableness of the decision reached." *Bridges v. Bowen*, 815 F.2d 622, 624 (11th Cir. 1987) (citing *Arnold v. Heckler*, 732 F.2d 881, 883 (11th Cir. 1984)). Failure to apply the correct legal standards is grounds for reversal. *See Bowen v. Heckler*, 748 F.2d 629, 635 (11th Cir. 1984).

## V.    Discussion

Ms. Pearson alleges that the ALJ's decision should be reversed and remanded because the ALJ committed error in making the decision. Doc. 14 at 3. Specifically, Ms. Pearson argues that the ALJ "misrepresent[ed] vocational expert testimony . . . and rel[ied] on that misrepresentation," "improperly substitute[ed] his own lay

opinion . . . for that of the medical experts," and "fail[ed] to fully and fairly develop the record." *Id.*

### A. The Vocational Expert's Testimony

Ms. Pearson argues that the ALJ misrepresented the vocational expert's testimony regarding absenteeism. *Id.* at 3–4. The residual functional capacity in the ALJ's decision found that Ms. Pearson would "[o]ccasionally miss 1 day of work per month due to impairments." R. 21. Ms. Pearson argues that because the vocational expert was not asked about "missing one day of work during the probationary period," the vocational expert's testimony was either incomplete or contradictory to the ALJ decision making the ALJ's decision "unsupported by substantial evidence." Doc. 14 at 4.  This argument fails.

"In order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments." *Wilson v. Barnhart*, 284 F.3d 1219, 1227 (11th Cir. 2002). The hypothetical question posed by the ALJ need not include impairments that the ALJ has properly determined to be unsupported by the evidentiary record. *Crawford v. Comm'r*, 363 F.3d 1155, 1161 (11th Cir. 2004).

After considering the "entire record," the ALJ found that Ms. Pearson has:

> the residual functional capacity to perform sedentary work
> as defined in 20 CFR 404.1567(a) except she [can]
> occasionally perform pushing or pulling with upper and
> lower extremities. She should perform no climbing of

ladders or scaffolds. She can occasionally climb ramps and stairs. She can occasionally perform balancing and stooping but no kneeling, crouching, or crawling. She can have only occasional exposure to extreme heat and cold. She can have occasional exposure to vibration; she can have occasional exposure to fumes, odors, chemicals, gases, dust, and poorly ventilated areas. She should perform no commercial driving. She should have no work requiring walking on uneven or slippery surfaces. She should have no exposure to dangerous machinery or unprotected heights.

During a regularly scheduled workday, or the equivalent thereof, individual can:

1. Understand and remember short and simple instructions, but is unable to [do] so with detailed and complex instructions.
2. Do simple, routine, repetitive tasks, but is unable to do so with complex tasks.
3. Deal with changes in workplace, if introduced occasionally, gradually, and well-explained.
4. Occasionally miss 1 day of work per month due to impairments.

R. 21. At the administrative hearing, the ALJ posed a series of hypotheticals to the vocational expert. R. 59–61. This series of questions included hypothetical number one, which incorporated the residual functional capacity as determined by the ALJ after his review of the record:

Q: All right. Mr. Pearson I would like to ask you some hypothetical questions. First hypothetical I'd like you to assume an individual of Ms. Pearson's age, education and work experience who could perform work at the sedentary exertional level with the following limitations, occasional pushing and pulling with both upper and lower extremities, no climbing of ladders, scaffolds, occasional

climbing of ramps and stairs, occasional balancing, occasional stooping, no kneeling, no crouching, no crawling, only occasional exposure to extreme heat and cold, occasional exposure to vibrations, occasional exposure to fumes, odors, chemicals, gases, dust, poorly ventilated areas, no commercial driving, no work requiring walking on uneven or slippery surfaces, also, during a regular scheduled work day or the equivalent thereof the individual can understand and remember short and simple instructions but is unable to do so with detailed or complex instructions and do simple routine, repetitive tasks but is unable to do so with detailed and complex tasks, can deal with changes in the workplace, has to be occasionally, gradually, well-explained and may occasionally miss one to two days of work per month due to impairments. With those limitations could such an individual perform any of Ms. Pearson's past work?

A: Your Honor, with this hypothetical, this hypothetical individual would be unable to perform any past work.

Q: Could such a person with those limitations perform any work in the national economy?

A: Your Honor, there would be sedentary jobs that would accommodate this hypothetical, Your Honor. The first one would be a table worker . . . order clerk . . . and cuff . . . folder . . . .

R. 59–60. The ALJ continued by asking a second hypothetical that incorporated an additional limitation regarding absenteeism – namely, a hypothetical individual that "would be expected to miss four or more days of work per month." R. 61. In explaining that "with this hypothetical there would be no work," the vocational expert explained probationary periods and absenteeism. R. 61. He stated:

> Your Honor, they have 30 days for a probationary period
> for simple, unskilled work. After that period has expired
> any days absent less than three a month [is] usually
> acceptable by an employer. Anything, three or more days
> would be considered excessive and would not be tolerated
> by any employer.

R. 61.

The ALJ included all of the limitations in Ms. Pearson's residual functional capacity in the first hypothetical he posed to the vocational expert. Contrary to Ms. Pearson's assertion that "the ALJ initially said nothing about absenteeism in the hypothetical he[] presented," Doc. 14 at 4, the ALJ in fact included in the first hypothetical a higher occurrence of absenteeism than the residual functional capacity determination included. R. 59–60. While the residual functional capacity incorporated occasionally missing one day of work a month, the first hypothetical posed to the vocational expert incorporated "occasionally miss[ing] one to two days of work per month due to impairments." R. 60. Therefore, the vocational expert's testimony was based on a proper statement by the ALJ and constitutes substantial evidence supporting the ALJ's decision.

As for Ms. Pearson's claim that her impairments would cause her to be absent in excess of employer tolerances specifically during the probationary period, that argument fails. The second hypothetical incorporated absenteeism in excess of the determined residual functional capacity – namely, missing four or more days per month. R. 61. In response to that hypothetical, when opining that "three or more

days [absent] would be considered excessive and would not be tolerated by any employer," the vocational expert also mentioned the probationary period. R. 61. The residual functional capacity did not incorporate four or more days a month absent. As a result, the ALJ was not required to rely on the vocational expert's response to the second hypothetical. *Brown v. Comm'r*, 680 F. App'x 822, 828 (11th Cir. 2017). The ALJ did not err in determining that jobs existed in the national economy that Ms. Pearson could perform.

### B.  The ALJ's Treatment of Medical Opinions

Ms. Pearson also argues that the ALJ erred by substituting his own lay opinion about Ms. Pearson's impairments for that of "every medical professional who offered an opinion about Ms. Pearson's ability to perform work related tasks." Doc. 14 at 5, 7. Specifically, Ms. Pearson states that the ALJ erred in rejecting the opinion of Dr. Prohaska, the state agency physicians, and Dr. Patton. *Id.* at 7–11.

The SSA has revised the applicable regulations related to medical opinion evidence. Historically, the treating source rule provided that a treating physician's opinion was entitled to substantial weight unless good cause is shown to the contrary. *See* 82 Fed. Reg. 5844-01 at 5853 (Jan. 18, 2017); *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986) (explaining the treating source rule). The SSA formalized the treating source rule in 1991 when it implemented regulations that required ALJs to "give more weight to opinions" from treating sources and to "give

good reasons . . . for the weight . . . give[n] [a] treating source's opinion." 20 C.F.R. § 404.1527(c)(2).

The SSA's new regulations, promulgated in 2017, do away with the hierarchy of medical opinions and the treating source rule. *Id.* at § 404.1520c(a). Under the new regulations, an ALJ need not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)" for all claims filed on or after March 27, 2017. *Id.* And the ALJ "will articulate in [his] determination or decision how persuasive [he] find[s] all of the medical opinions . . . in [the claimant's] case record." *Id.* at § 404.1520c(b).

When evaluating the persuasiveness of the opinions, the ALJ considers these factors: (1) supportability, i.e., how "relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s)"; (2) consistency with the evidence; (3) relationship with the claimant, including the nature of the relationship, the length of the treatment relationship, the frequency of examinations, and the extent of the treatment relationship; (4) specialization; and (5) "[o]ther factors," such as the medical source's familiarity with the agency's policies and the evidence in the claim. *Id.* at § 404.1520c(c). It is not improper for an ALJ to consider a claimant's daily activities when evaluating a medical opinion. *See id.* at § 404.1520c(c)(5) (stating that an ALJ may consider any other relevant factors "that tend to support or contradict a medical

opinion"). Supportability and consistency are the most important of the five factors, and an ALJ must "explain how [he] considered the supportability and consistency factors for a medical source's medical opinions . . . in [his] . . . decision." *Id.* at § 404.1520c(b)(2). The ALJ may explain how he considered the remaining factors, but he is not required to do so. *Id.*

The court will apply the 2017 regulations. Ms. Pearson concedes that she applied for benefits after March 27, 2017. Doc. 14 at 1. Ms. Pearson argues that the new regulations are not entitled to deference because "to the extent that the 2017 regulations purport to direct how the courts may evaluate whether substantial evidence supports the Commissioner's decision, . . . those regulations exceed their statutory authority as 42 U.S.C. § 405(g) expressly gives that authority to the courts." Doc. 20 at 5. But the Eleventh Circuit has applied the new regulations and held that "the Commissioner eliminated the treating-physician rule" and the new regulations "abrogate[s] our earlier precedents applying the treating-physician rule." *Harner v. Comm'r*, 38 F.4th 892, 896–97 (11th Cir. 2022). *See also Matos v. Comm'r*, No. 21-11764, 2022 WL 97144, at *4 (11th Cir. Jan. 10, 2022) (stating that the "new regulatory scheme no longer requires the ALJ to either assign more weight to medical opinions from a claimant's treating source or explain why good cause exists to disregard the treating source's opinion"); *Glasby v. Comm'r*, No. 21-12093, 2022 WL 1214015, at *3 (11th Cir. Apr. 25, 2022) (finding the agency did not err when

applying the new regulations to the opinion of the claimant's treating physician); *Jones v. Comm'r*, No. 22-10507, 2022 WL 3448090, at \*1 (11th Cir. Aug. 17, 2022) ("Under the new regulation, an ALJ is to give a treating physician's opinions no deference and instead must weigh opinions based on their persuasiveness."). Accordingly, the court will apply the 2017 regulations – not the treating source rule – to the ALJ's evaluation of the opinion evidence.

*First,* Ms. Pearson argues that the ALJ failed to accord proper weight to an October 10, 2018, Confidential Disability Evaluation by Dr. Mark Prohaska conducted at the request of the Disability Determination Service. Doc. 14 at 7–8; *see also* Doc. 20 at 6–7. In his evaluation, Dr. Prohaska stated that Ms. Pearson has "a history of seizure disorder" and "additionally reports cognitive symptoms that include poor memory . . . as well as intermittent diplopia that is associated with nausea." R. 525. Dr. Prohaska also noted Ms. Pearson's additional medical issues such as migraines, Crohn's disease, lymphocytes colitis, heart problems, tremors, and poor equilibrium. R. 525. Dr. Prohaska's evaluation also discussed Ms. Pearson's daily activities, mental status, cognitive assessment, and effort/motivation/validity. R. 525–26. Dr. Prohaska's diagnostic impressions were as follows: Axis I – Neurocognitive Disorder (mild, secondary to seizure disorder); Axis II – No diagnosis; Axis III: Deferred to medical professionals. R. 526. Dr. Prohaska provided this prognosis and summary:

> From a cognitive standpoint, Ms. Pearson appears to be functioning in the average range of intelligence; however, based on her self-report, she has limitations in cognitive abilities since the onset of her seizure disorder that are impacting her daily functioning (particularly in attention, concentration, and memory). Although there was some evidence of cognitive limitations on the brief metal status examination conducted as part of this evaluation, additional testing with more extensive and sensitive neurocognitive measures would be needed to fully identify underlying cognitive deficits and determine their functional impact. Ms. Pearson denies any significant struggles with anxiety or depression, and although her range of interests and desire to interact with others appears to be typical of others in her age-group, based on her self-report, she has had to stop engaging in many activities since the onset of her seizures. Her daily activities, ability to function independently, and employability appear to be primarily limited by her seizure disorder and other physical/medical issues, the assessment of which is beyond the scope of this evaluation, though underlying cognitive deficits related to her seizures may present additional obstacles as well. Based on her self-report, Ms. Pearson requires assistance managing finances.

R. 526.

The ALJ considered Dr. Prohaska's Confidential Disability Evaluation, discussed it in his residual functional capacity findings, R. 25, and included in his decision the limitations and findings discussed above, as follows:

> I have found the October 2018 opinion of the psychological consultative examiner, Dr. Prohaska, to not be as persuasive as the treatment medical notes in the record (Exhibit B10F). Dr. Prohaska provided in his consultative examination report that the claimant was functioning in the average range of intelligence; however, based on her self-report, she indicated that she had

> limitation in cognitive abilities since the onset of her
> seizure disorder that were impacting her daily functioning
> (particularly in attention, concentration, and memory).
> Additionally, Dr. Prohaska noted that although her range
> of interest and desire to interact with others appear[ed] to
> be typical of others in her age-group, based on her self-
> report, she has had to stop engaging in many activities
> since the onset of her seizures. In addition, Dr. Prohaska
> notes that the claimant's daily activities, ability to function
> independent, and employability appear[ed] to be primarily
> limited by her seizure disorder and other physical/medical
> issues.

R. 26.

As an initial matter, the ALJ articulated how persuasive he found the opinion, as required by the regulations. *See* 20 C.F.R. § 404.1520c(b). The ALJ "considered th[is] medical opinion[] . . . in accordance with the requirements of 20 CFR 404.1520c." R. 21–22. Additionally, he stated: "As for medical opinion(s) . . . , I will not defer or give any specific evidentiary weight, including controlling weight, to . . . medical opinion(s), including those from the claimant's medical sources." R. 26.

Ms. Pearson argues that the ALJ did not give sufficient rationale for rejecting the opinion of Dr. Prohaska. Doc. 14 at 7. However, instead of analyzing the rationale provided, Ms. Pearson simply points to two items from Dr. Prohaska's Confidential Disability Evaluation that were not included in the ALJ's discussion – *first*, that "additional testing with more extensive and sensitive neurocognitive measures would be needed to fully identify underlying cognitive deficits and determine their functional impact," and *second*, that "daily activities, ability to

28

function independently, and employability appeared to be limited by her seizure disorder and other physical/medical issues," but that this assessment was beyond the scope of his evaluation. Doc. 14 at 7–8.

To the extent that Ms. Pearson's statement criticizing the rationale given for rejecting the opinion of Dr. Prohaska is an argument based on the treating source rule, that argument fails because the applicable regulations no longer employ that rule. *See* 20 C.F.R. § 404.1520c. And although Ms. Pearson makes a specific argument regarding supportability and consistency in her reply brief, Doc. 20 at 6, she references the ALJ's discussion of Dr. Patton's opinion, not Dr. Prohaska's opinion. *Id.* Ms. Pearson has not made an argument under the new regulations as it relates to the ALJ's discussion of Dr. Prohaska's Confidential Disability Evaluation, nor has Ms. Pearson identified functional limitations from Dr. Prohaska's Confidential Disability Evaluation that indicate greater residual functional capacity limitations than those included by the ALJ.

The ALJ applied the correct legal standards in evaluating Dr. Prohaska's opinion, and substantial evidence supports his finding that it was "not . . . as persuasive as the treatment medical notes in the record." *See* R. 26. In fact, the ALJ included in the residual functional capacity limitations to understanding and remembering that were not included in Dr. Prohaska's evaluation. *See* R. 21. Ms.

Pearson has not shown that the ALJ erred in his consideration of the Confidential Disability Evaluation.

*Second,* Ms. Pearson argues that the ALJ failed to accord proper weight to the state agency physician and state agency psychiatrist. Doc. 14 at 8. However, Ms. Pearson also states that she "agrees that the ALJ should have rejected the opinion of the state agency reviewing doctors." *Id.* Ms. Pearson argues that the ALJ's rejection of these opinions left the residual functional capacity unsupported by doctors' opinions. But the ALJ bears the responsibility for assessing a claimant's residual functional capacity. *See, e.g.,* 20 C.F.R. § 404.1546(c) ("If your case is at the [ALJ] hearing level . . . , the [ALJ] . . . is responsible for assessing your residual functional capacity."). Ms. Pearson has identified no error in the ALJ's consideration of the state agency opinions in forming her residual functional capacity.

*Third*, Ms. Pearson argues that the ALJ failed to accord proper weight to the March 5, 2019 medical source statement from her treating neurologist, Dr. Thomas Patton. Doc. 14 at 8–11; *see also* Doc. 20 at 6–7. In the questionnaire completed by Dr. Patton, he noted that he had been treating Ms. Pearson for chronic migraines since November 29, 2012. R. 529. Dr. Patton also opined that Ms. Pearson was "[u]nable to sustain an 8-hour work day in a competitive work environment"; Ms. Pearson's "condition [was] expected to last 12 months or longer at the current level of severity"; and that "Ms. Pearson would be unable to complete an 8-hour workday

or be absent from work as a result of physical and/or mental impairments" an average of four days per month. R. 529.

The ALJ considered Dr. Patton's questionnaire responses and included in his decision the limitations and findings discussed above, as follows:

> Dr. Patton indicates the claimant has a diagnosis of chronic migraines. Dr. Patton further notes that the claimant would be unable to sustain an eight hour work day in a competitive work environment, and he further indicated that the severity of the claimant's condition was expected to last 12 months or longer at the current level. Additionally, Dr. Patton provided that the claimant would be unable to complete an eight hour workday or be absent from work as a result of physical and/or mental impairments for four days. Dr. Patton's opinion is found to be inconsistent and not supported by the treatment medical history in record, the claimant's noted activities of daily living, etc.

R. 26. The ALJ "considered th[is] medical opinion[] . . . in accordance with the requirements of 20 CFR 404.1520c." R. 21–22. The ALJ found Dr. Patton's opinion to be "very conclusive and not persuasive." R. 26.

Before the ALJ made this finding with respect to Dr. Patton's medical source statement, the ALJ detailed Ms. Pearson's history of migraines and the treatment she has received. R. 22–23. In this section of his decision, the ALJ specifically referenced Dr. Patton's medical treatment notes:

> The claimant's physician, Thomas Patton, M.D., treatment medical notes have shown the claimant to have only a few "spells," and the claimant further reported during appointments with Dr. Patton that her headaches were

31

"better in terms of her migraines and the emgality seems to be helping most months" (Exhibit B16F, page 1). Additionally, the claimant was noted to not be taking clonazepam, noting that the "headaches have been better" (Exhibit B16F, page 1). The claimant was also noted to have Botox injections which the claimant was noted to tolerate the procedure well with no side effects. Additionally, Dr. Patton noted the claimant reporting initially getting "some better from neurostimulator placement" (Exhibit B16F, page 4). It was further noted that it was unclear if the neurostimulator placement was still working, but it was noted that there was some battery issues resulting in her being unable to use it. The medical evidence and other evidence in the record does not support the claimant to be as limited as alleged by her migraines.

R. 23.

Ms. Pearson argues that the ALJ's statement that "Dr. Patton's opinion is found to be inconsistent and not supported by the treatment medical history in record, the claimant's noted activities of daily living, etc." is "unsupported by any evidence." Doc. 14 at 8–9. Ms. Pearson also argues that the ALJ did not articulate good cause for his rejection of Dr. Patton's medical source statement or state with particularity the weight given. *Id.* Finally, Ms. Pearson argues that "[t]o the extent that the ALJ's rejection of Dr. Patton's opinion was based upon her daily activities, the ALJ failed to explain how those activities contradict Dr. Patton's opinion." *Id.* at 10.

These arguments fail because the issue before the court is whether substantial evidence supports the ALJ's decision, not whether some evidence may support a

contrary decision. *See Martin*, 894 F.2d at 1529. As discussed below, substantial evidence supports the ALJ's finding that Dr. Patton's opinion was inconsistent with the medical treatment record and Ms. Pearson's activities of daily living.

As an initial matter, the ALJ articulated how persuasive he found the opinion, as required by the regulations. *See* 20 C.F.R. § 404.1520c(b). The ALJ "considered th[is] medical opinion[] . . . in accordance with the requirements of 20 CFR 404.1520c." R. 21–22. Additionally, he stated: "As for medical opinion(s) . . . , I will not defer or give any specific evidentiary weight, including controlling weight, to . . . medical opinion(s), including those from the claimant's medical sources." R. 26.

Under the new regulations, the ALJ adequately accounted for his finding regarding Dr. Patton's medical source statement. The ALJ's decision reflects that he considered Dr. Patton's extensive treatment notes in his analysis. R. 23. The ALJ expressly considered each of Ms. Pearson's medical records by diagnosis in connection with his opinion about each medical opinion – headaches and blurry vision, seizures, low back pain, Crohn's disease, complex regional pain syndrome, heart problems, and mental impairments. R. 22–26. Additionally, the ALJ cited other medical evidence in the record that was inconsistent with Dr. Patton's medical source statement. R. 22–23, 26. For example, the ALJ cited Ms. Pearson's September 13, 2019 visit that indicated she was having only a few spells, her migraines were better, she tolerated the Botox injections, and the migraine

medication seemed to be working. R. 23, 604–05. The ALJ also cited Dr. Patton's treatment notes when discussing Ms. Pearson's history of migraines. R. 22; *see also* R. 457–524, 529–47.

Ms. Pearson's argument that the ALJ "failed to explain how [her daily] activities contradict Dr. Patton's opinion" also fails. Doc. 14 at 10. In her adult function report, Ms. Pearson stated that she: performs household chores, completes puzzles, reads, cares for her two dogs, shops, watches television, talks on the phone, spends time with family, and attends church and school functions. R. 240–47. Additionally, the ALJ noted Ms. Pearson's daily activities as only one inconsistency with Dr. Patton's medical source statement, rather than relying on them solely to determine Ms. Pearson's level of impairment. R. 26. As discussed above, the ALJ relied on other record evidence in addition to Ms. Pearson's daily activities when evaluating Dr. Patton's opinion, including his own examination findings and the "very conclusive" nature of the opinion.

The ALJ applied the correct legal standards in evaluating Dr. Patton's opinion, and substantial evidence supports his finding that it was inconsistent with his own treatment records and the medical records as a whole. Ms. Pearson has not shown that the ALJ erred in his consideration of the medical opinion evidence.

### C. Lack of SSA-Directed Medical Testing

A disability is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual claiming benefits must prove that she is disabled. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). The burden is on the claimant to introduce evidence in support of her application for benefits. *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003).

The Commissioner is not required to hire an expert medical source when determining whether a claimant is disabled. 20 C.F.R. §§ 404.1513a(b)(2), 404.1517; *Klawinski v. Comm'r of Soc. Sec.*, 391 F. App'x 772, 776 (11th Cir. 2010) (holding that because "the ALJ ultimately found that [claimant] was not disabled . . . SSR 83–20 only required the ALJ to obtain a medical expert in certain instances to determine a disability onset date"); *Wilson v. Apfel*, 179 F.3d 1276, 1278 (11th Cir. 1999) (recognizing that the ALJ is not "obligated to seek independent, additional expert medical testimony" when the record is sufficient to support the ALJ's decision). Instead, "the ALJ has a basic obligation to develop a full and fair record." *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997). "The court should be guided by whether the record reveals evidentiary gaps which result in unfairness or 'clear prejudice.'" *Id.* at 1423.

In her post-hearing brief, Ms. Pearson's attorney wrote to the ALJ: "Should you find that the record does not support a fully favorable decision as of the amended onset date of April 11, 2018, we ask that you schedule a full neuropsych evaluation. This was recommended [by] the Social Security Administration consultative evaluator, Dr. Mark Prohaska, at Exhibit 10F, page 2. The treating neurologist, Dr. Thomas Patton, concurred with the recommendation for a full neuropsych evaluation, at Exhibit 9F, page 5[.]" R. 276. Here, Ms. Pearson argues that remand is necessary because "the ALJ did not obtain the necessary testing, but proceeded to decide the claim without it" and on "inadequate evidence." Doc. 14 at 12–13.

Although Ms. Pearson argues that there is a lack of testing to identify cognitive deficits and determine their functional impact, the ALJ discussed "symptoms and limitations from mental impairments" in his residual functional capacity analysis. R. 25. For example, the ALJ noted that Ms. Pearson "reported having memory problems, low concentration, poor sleep, spells of decreased attentiveness, and low energy" and cited corresponding medical records. R. 25. The ALJ observed that Ms. Pearson "has been noted to have some symptoms related to her mental impairments," but also stated that she was an "accurate historian" "with no abnormalities . . . that interfered with her ability to communicate" and had "an average level of interacting," "normal cognitive function," "normal concentration," and "average intelligence functioning." R. 25–26. Also, the ALJ specifically

included mental functional limitations in Ms. Pearson's residual functional capacity. R. 21. For example, the residual functional capacity limited Ms. Pearson to work that included: understanding and remembering "short and simple instructions," as opposed to "detailed and complex instructions"; completing "simple, routine, repetitive tasks," as opposed to "complex tasks"; and occasional, gradual, and well-explained "changes in [the] workplace." R. 21. Therefore, the record here was neither incomplete nor inadequate as it related to Ms. Pearson's cognitive deficits. Instead, the record was sufficient for the ALJ to evaluate Ms. Pearson's impairments and craft a residual functional capacity that incorporated her abilities. Substantial evidence supports the ALJ's consideration of Ms. Pearson's impairments, and Ms. Pearson has failed to establish that the ALJ had any obligation to further develop the record.

## VI.   Conclusion

Upon review of the administrative record, the court finds the Commissioner's decision is supported by substantial evidence and in accord with the applicable law. A separate order will be entered.

**DONE** and **ORDERED** this 28th day of September, 2022.

_____
**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE